UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No.  14-cv-04687-HSG

ALFREDO RAIGOSA ARREDONDO,

Plaintiff,

v.

THOMAS DRAGER, et al.,

Defendants.

**ORDER DENYING MOTION TO
DISMISS; GRANTING IN PART AND
DENYING IN PART MOTION FOR
SUMMARY JUDGMENT; DENYING
MOTION TO STRIKE SURREPLY;
REFERRING CASE TO SETTLEMENT
PROCEEDINGS; STAYING AND
ADMINISTRATIVELY CLOSING
CASE; INSTRUCTIONS TO CLERK**

Re: Dkt. No. 34, 52

## INTRODUCTION

Plaintiff, a California prisoner currently incarcerated at Calipatria State Prison, filed this

*pro se* civil rights action under 42 U.S.C. § 1983, regarding events that took place while he was

incarcerated at Pelican Bay State Prison ("PBSP").  Plaintiff seeks declaratory relief and nominal,

compensatory, and punitive damages.  Docket No. 8 ("FAC") at 11.  The Court found that,

liberally construed, the first amended complaint stated cognizable claims that PBSP officers

Drager and Brunner retaliated against Plaintiff for engaging in hunger strikes and filing lawsuits

against PBSP staff, in violation of the First Amendment; and were deliberately indifferent to

Plaintiff's safety, in violation of the Eighth Amendment.  Docket No. 15 at 2–3.

Now before the Court is Defendants' motion to dismiss and for summary judgment.

Docket No. 34.  Plaintiff has filed an opposition to the motion to dismiss and for summary

judgment (Docket No. 48), Defendants have filed a reply (Docket No. 50), and Plaintiff has filed a

1    sur-reply (Docket No. 51).[1] For the reasons set forth below, the Court DENIES Defendants'

2    motion to dismiss, and GRANTS IN PART AND DENIES IN PART Defendants' motion for

3    summary judgment.

4                                            **BACKGROUND**

5        At all times relevant to this action, Plaintiff was incarcerated in PBSP's Security Housing

6    Unit ("SHU"), Facility C, Unit 3, C Pod, Cell 211.[2]  Docket No. 48 at 17.

7    **I.    HUNGER STRIKE PARTICIPATION**

8        On July 8, 2013, Plaintiff commenced a hunger strike to protest his SHU living conditions.

9    FAC at 4–5.  On July 10, 2013, Plaintiff was issued a rules violation report ("RVR") for willfully

10   delaying a police officer by participating in a mass hunger strike.  Docket No. 1-1 at 17.

11       On July 12, 2013, Plaintiff suspended his hunger strike.  FAC at 6.

12       On August 5, 2013, Plaintiff resumed his hunger strike.  FAC at 6.

13       On Thursday, August 8, 2013, Plaintiff was again issued a rules violation report ("RVR")

14   for willfully delaying a police officer by participating in a mass hunger strike.  Docket No. 1-2 at

15   16.

16       That same day, at approximately 4 p.m., Officer Drager yelled loudly into the Unit C3:

17   "Dumbrique 112, Belmudes 212, and Arredondo 211, pack up your property and get ready to

18   move to the Debriefer Unit."  Docket No. 48 at 17, 23, and 27.  Dumbrique responded, "Why?

19   We are not debriefers."  Docket No. 48 at 17, 23, and 27.  Officer Drager replied, "That's not what

20   I heard, pack it up!"  Docket No. 48 at 17, 23, and 27.  Officer Drager spoke loudly enough to be

21   heard in the remaining pods throughout the prison block.  Docket No. 48 at 17.  Officer Drager

22   denies making these statements.  Docket No. 36 ("Drager Decl.") ¶ 5.

23       Later that day, Officer Drager entered C Pod to pass out mail.  Docket No. 48 at 17, 23,

24

25   _____

     [1] In the interest of justice, the Court considers Plaintiff's sur-reply. Therefore, Defendants' motion
26   to strike the sur-reply (Docket No. 52) is DENIED.
     [2] Pelican Bay is comprised of four facilities, designated as Facilities A, B, C, and D.  Facility C is
27   comprised of 12 housing units, designated as C1 through C12.  Each of the twelve housing units is
     comprised of six pods, designated as Pods A through F.  Each pod is comprised of eight
28   cells.  Unit C12 is the closest housing unit to the Facility C medical clinic.  Docket No. 35
     ("Brunner Decl.") ¶ 5.

United States District Court
Northern District of California

1   and 27.  Dumbrique asked why Officer Drager was addressing the inmates at a volume that

2   allowed everyone to hear that Officer Drager was referring to Dumbrique, Belmudes, and

3   Arredondo as debriefers.  Docket No. 48 at 17, 23, and 27.  Officer Drager responded, "You guys

4   want to play games with this hunger strike and make my job hard, I can play games too.  You guys

5   are moving to that unit one way or another!  Either eat or pack it up!"  Docket No. 48 at 17, 23,

6   and 27.  Officer Drager denies making these statements.  Drager Decl. ¶ 5.

7        At that time, Officer Drager was assigned to Unit C3 and his duties included assisting

8   inmates with housing transfers.  Drager Decl. ¶ 2.  In facilitating a housing transfer, Officer

9   Drager's usual practice was to instruct the inmate to pack his items, give the inmate plastic bags

10  for his property, bring the inmate a pushcart to place his items on, place the inmate in restraints,

11  escort the inmate and his property to the new cell, remove the restraints from the inmate, and

12  remove the inmate's property from the pushcart.  Drager Decl. ¶ 6.  Officer Drager states that he

13  does not recall facilitating Plaintiff's housing transfer on August 8, 2013.  Drager Decl. ¶ 6.

14  Officer Drager states that he was aware that Plaintiff was involved in a hunger strike, but was not

15  aware of any complaints filed by Plaintiff against the California Department of Corrections and

16  Rehabilitation ("CDCR") or CDCR employees.  Drager Decl. ¶ 5.

17       In accordance with Officer Drager's orders, Plaintiff packed up his property and moved to

18  Unit C12 on August 8, 2013.  FAC at 7.  Officers Drager and Brunner had no involvement in the

19  decision to transfer Plaintiff.  Docket No. 35 ("Brunner Decl.") ¶ 9; Drager Decl. ¶ 7.

20       Plaintiff alleges that Unit C12 is the designated "debriefer unit" which houses inmates who

21  are completing the debriefing process, who are also known as prison informants or snitches.  FAC

22  at 7 and Docket No. 48 at 23–24 and 28.  Plaintiff alleges that prison snitches or informants are

23  targeted for assault by the vast majority of the prison population, and are therefore housed

24  separately for their safety.  Docket No. 48 at 24.  Defendants claim that PBSP does not have a

25  designated housing unit for debriefing inmates.  Docket No. 37 ("Olson Decl.") ¶ 6.  Defendants

26  acknowledge that PBSP attempts to separate prison gang affiliates from debriefing inmates by

27  housing them in different pods.  *Id*. ¶ 7.  Defendants state that during the 2013 mass inmate hunger

28  strike, certain hunger strike participants were relocated to Unit C12 due to "institutional need."  *Id*.

¶ 10.  Unit C12 is "within close proximity to program and medical facility in [Facility] C SHU." *Id.*  Plaintiff states that "Unit [C]12 is the furthest from the medical facility."  Docket No. 51 at 2.

Plaintiff resumed eating on the evening of August 10, 2013.  Docket No. 39 ("Thornton Decl."), Ex. A.

## II.   EVENTS WHILE HOUSED IN UNIT C12

Five other inmates were also moved from Units C3 and C2 to Unit C12 during this same time period.  FAC at 9.  These inmates — Daniel Treglia, Edward Dumbrique, Antonio Ruiz, Jose Argumedo, and Daniel Belmudes — were involved in the hunger strike.  FAC at 9; Docket No. 1-4 at 13–22.  These inmates also had a history of litigation against PBSP or CDCR officials. FAC at 9–11.

During the relevant time period, Officer Brunner served as the Unit C12 control booth relief officer on Saturdays and Sundays.  Brunner Decl. ¶¶ 2, 4.  Officer Brunner's duties consisted of operating the switchboard that which opens and shuts the doors to Unit C12, thereby controlling the movement of inmates and prison staff in and out of Unit C12; and monitoring the activities of inmates and prison staff in Unit C12 though closed circuit televisions and radios.  *Id.* ¶ 2.

On Saturday, August 17, 2013, at approximately 5 p.m., as floor officers were passing out dinner trays, Officer Brunner announced loudly to the other officers: "D Pod is where all the debriefers slash hunger strikers are."  FAC at 8 and Docket No. 48 at 17–18, 20, 24, 28, and 32. Plaintiff was housed in D Pod at that time.  FAC at 8.  Officer Brunner spoke loudly enough to be heard by all inmates in adjacent pods or sections.  FAC at 8 and Docket No. 48 at 17–18, 20, 24, 28, and 32.  Officer Brunner denies making this statement.  Brunner Decl. ¶ 10.

Information identifying the D Pod inmates by name, CDCR number, and photograph is posted outside D Pod and publicly visible.  FAC at 8.

The inmates housed on the bottom tier of D Pod — Antonio Ruiz, Jose Argumedo, and Daniel Treglia — immediately called out to Officer Brunner.  FAC at 8; Docket No. 48 at 18, 20, 24, 28, and 32.  Ruiz, Argumedo, and Treglia asked Officer Brunner about his comment and demanded that Officer Brunner tell the inmates housed in the other C12 pods that they were not

United States District Court
Northern District of California

debriefers and that Officer Brunner was just being spiteful.  FAC at 8; Docket No. 48 at 18, 20, 24, 28, and 32.  Officer Brunner responded, "Take your trays and I'll think about it."  FAC at 8; Docket No. 48 at 18, 20, 24, 28, and 32.

The inmates did not take their dinner trays and Officer Brunner did not tell the other inmates housed in C12 that D Pod inmates were not debriefers.  FAC at 8.  After the dinner tray pickup, Ruiz asked Officer Brunner why he would say something like that about the D Pod inmates when Officer Brunner did not even know them.  FAC at 8.  Officer Brunner responded that "the captain had all [the D Pod inmates] on 'shit status' for filing lawsuits and being hungerstrike flip-floppers."  FAC at 8 and Docket No. 48 at 7.  Officer Brunner also said that the D Pod inmates "should not have let [prison officials] move [the D Pod inmates] to this building (C12) in the first place cause now you're stuck here.  There's where you guys fucked-up."  FAC at 8 and Docket No. 48 at 18, 20, 25, 28, and 32.

Plaintiff was housed in Unit C12 from August 8, 2013 to approximately January 15, 2014, when he was moved to Unit C1.  Thornton Decl. ¶ 7.  Between August 8, 2013, when Plaintiff was transferred to Unit C12, to October 21, 2014, the date Plaintiff initiated the instant action, Plaintiff was not involved in any altercations with other inmates.  Thornton Decl. ¶ 8.

On or about October 15, 2015, Plaintiff was transferred to Calipatria State Prison and housed with the general population.  Docket No. 51 at 3.  Plaintiff claims that he is now in danger at Calipatria State Prison because his fellow inmates at Calipatria State Prison do not trust him due to his being labelled a debriefer by Defendants.  Docket No. 51 at 2.  Plaintiff claims that the reason he was not involved in altercations while at PBSP was because he was incarcerated in the SHU where inmates do not share cells and inmates are escorted by guards whenever they are out of their pods.  Docket No. 51 at 3.

## III.     PLAINTIFF'S GRIEVANCES, COURT ACTIONS AND PETITION

Plaintiff has filed the following actions:

- ◆ *In re Alfredo Arredondo*, C No. CHW-2473, was filed in Lassen County Superior Court in 2008.  In this action, Plaintiff challenged his validation as a prison gang member and subsequent placement in SHU.  The state superior court denied this habeas petition on July 28, 2008.  Docket No. 1-4 at 5–7.

1
2

◆ *In re Alfredo Arredondo*, C No. CPB-12-5142, was filed in Del Norte County Superior Court in 2012. In this action, Plaintiff alleged that the PBSP gang validation procedures violated his due process rights. The state superior court denied this habeas petition on October 22, 2012. Docket No. 1-4 at 10–12.

3
4

Plaintiff has submitted the following prison grievances prior to engaging in the 2013 hunger strikes:

5
6

◆ Grievance number CRC-01-00272, regarding segregation,[3] which was denied on January 28, 2002. Docket No. 1-3 at 19.

7

◆ Grievance number HDSP-07-00686, regarding program,[4] which was denied on July 23, 2007. Docket No. 1-3 at 19.

8
9

◆ Grievance number HDSP-07-03447, regarding his validation as a prison gang member, which was denied on March 11, 2008. Docket No. 1-4 at 1–4.

10

◆ Grievance number HDSP-08-02399, regarding property,[5] which was denied on January 8, 2009. Docket No. 1-3 at 19.

11    Plaintiff has also filed a petition with the United Nations regarding conditions of confinement at

12    PBSP and within the CDCR. FAC at 9.

13                                                    **DISCUSSION**

14    **I.    MOTION TO DISMISS**

15          Defendants argue that the Court should dismiss Plaintiff's First Amendment retaliation

16    claim because the mere threat of future harm does not provide the basis for a cognizable § 1983

17    claim and because participation in a hunger strike is not a "protected activity." Docket No. 34 at

18    15–18. Plaintiff does not directly address these arguments in his opposition or in his surreply.

19          **A.    Standard of Review**

20          Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss on the

21    ground that there is a "failure to state a claim upon which relief may be granted." Fed. R. Civ. P.

22    12(b)(6). A motion to dismiss should be granted if a plaintiff fails to proffer "enough facts to state

23    a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

24    (2007). The court "must accept as true all of the factual allegations contained in the complaint,"

25

26    ───────────
      [3] Plaintiff provides no other details about the subject matter of this grievance, or about its disposition.

27    [4] Plaintiff provides no other details about the subject matter of this grievance, or about its disposition.

28    [5] Plaintiff provides no other details about the subject matter of this grievance, or about its disposition.

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and must construe *pro se* pleadings liberally, *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).  The court need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended*, 275 F.3d 1187 (9th Cir. 2001).

### B.    Analysis

#### 1.  42 U.S.C. § 1983 claims

Defendants argue that Plaintiff fails to state a claim under 42 U.S.C. § 1983 because Plaintiff's allegation that Defendants' actions have exposed him to the possibility of future harm is insufficient to state cognizable § 1983 claims.  In support of their argument, Defendants cite an unpublished disposition, *Williams v. Lopez*, No. 94-15150, 1994 WL 526200, at *2 (unpub. disp.) (9th Cir. Sept. 27, 1994).  In *Williams*, the prisoner, who was serving a sentence for committing lewd and lascivious acts upon a child, alleged that a prison official had been deliberately indifferent to his safety when the prison official remarked: "Oh! You like children do you?"  1994 WL 526200, at *2.  The prisoner alleged that the remark would have had the effect of placing him in extreme danger if any prisoners had overheard the remark and had known of his crime.  *Id.*  The Ninth Circuit affirmed the district court's grant of summary judgment in favor of the prison official on this Eighth Amendment claim because the prisoner failed to present evidence that the remark had been heard by other prisoners or that the other prisoners would have sought to injure him.  *Id.*  The Ninth Circuit held that, under these circumstances, the remark could "only be regarded as verbal abuse and, as such, [was] not actionable."  *Id.*

The *Williams* case is inapplicable here for two reasons.

First, the standard of review for summary judgment motions differs significantly from the standard of review for motions to dismiss.  A court will grant a summary judgment motion "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In contrast, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain

United States District Court
Northern District of California

7

statement of the claim showing that the pleader is entitled to relief." *Erickson*, 551 U.S. at 93.  A plaintiff need only proffer enough facts to state a claim to relief that is plausible on its face.  *Bell Atlantic Corp.*, 550 U.S. at 570.  When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.  *Erickson*, 551 U.S. at 94. In *Williams*, the Ninth Circuit affirmed the district court's grant of summary judgment because the prisoner had failed to satisfy the standard for summary judgment.  However, in evaluating the instant motion to dismiss, the Court accepts as true all of Plaintiff's allegations in the FAC and liberally construes the FAC, *Hebbe*, 627 F.3d at 342.

Second, unlike the plaintiff-prisoner in *Williams*, Plaintiff alleges that Defendants' remarks were overheard by other prisoners, and that inmates known as debriefers are targeted for assault by other inmates.  While a threat or verbal abuse may be insufficient to state a constitutional violation, *see Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997), *overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (verbal harassment insufficient to state constitutional deprivation under 42 U.S.C. § 1983); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (mere threat does not constitute constitutional wrong, nor do allegations that naked threat was for purpose of denying access to courts compel contrary result), the Ninth Circuit has found that deliberately spreading a rumor that a prisoner is a "snitch" in response to a prisoner's attempt to seek redress for grievances may state a claim under 42 U.S.C. § 1983, *see Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989).  Accepting as true all of the factual allegations contained in the amended complaint, and keeping in mind that *pro se* pleadings must be liberally construed, *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988), the Court finds that Plaintiff's claim that prison officials labeled him a debriefer states a cognizable § 1983 claim.  Defendants' motion to dismiss Plaintiff's §1983 claims for failure to state a claim is DENIED.

### 2.  First Amendment Retaliation Claim

Defendants argue that Plaintiff fails to state a claim for First Amendment retaliation because a hunger strike is not "protected conduct" under the First Amendment.  *See Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (the five basic elements of a First Amendment

United States District Court
Northern District of California

1    retaliation claim in the prison context are: "(1) An assertion that a state actor took some adverse

2    action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action

3    (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

4    reasonably advance a legitimate correctional goal.").

5         Plaintiff argues in a conclusory fashion that he was exercising his free speech and

6    protesting SHU conditions when he went on a hunger strike.  In support of this assertion, Plaintiff

7    alleges that there is a right to refuse meals, citing *Swanigan v. Trotter*, 645 F. Supp. 2d 656, 682

8    (N.D. Ill. 2009) and *Hahn v. Walsh*, 915 F. Supp. 2d 925, 953 (C.D. Ill. 2013); that PBSP

9    recognizes an inmate's right to refuse food, citing the PBSP Hunger Strike Informational Sheet –

10   Refusing Food or Drink;[6] that there is a general liberty interest in refusing medical treatment,

11   citing *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990) and *Washington v. Harper*, 494

12   U.S. 210 (1989); that participating in a hunger strike is a medical decision protected by the

13   California probate code, citing *In re Conservatorship of Burton*, 170 Cal. App. 4th 1016 (2009)

14   and *Thor v. Sup. Ct.*, 5 Cal. 4th 725, 734 (1993); and that the National Labor Relations Act

15   ("NLRA") preserves the right to strike.  Docket No. 48 at 9.

16        As an initial matter, the Court notes that *Swanigan v. Trotter* and *Hahn v. Walsh* are out-

17   of-circuit district court cases and are therefore not binding on this Court.  *Camreta v. Greene*, 563

18   U.S. 692, 709 n. 7 (2011) ("'A decision of a federal district court judge is not binding precedent in

19   either a different judicial district, the same judicial district, or even upon the same judge in a

20   different case.'") (citing 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26

21   (3d ed. 2011)).  But the Court also finds that neither the PBSP informational sheet nor the

22   remaining cases establish that a hunger strike is a protected activity for the purposes of a First

23   Amendment retaliation claim.

24        Under certain circumstances, state prison regulations may create a liberty interest that is

25   protected under the Due Process Clause.  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 461

26   (1989).  To do so, the regulations must (1) "contain 'substantive predicates' governing an

27

28   _____

     [6] The PBSP Hunger Strike Informational Sheet is filed as an exhibit to Plaintiff's original
     complaint at Docket No. 1 at 16–17.

United States District Court
Northern District of California

9

United States District Court
Northern District of California

official's decision regarding a matter directly related to the individual"; and (2) "employ 'explicitly mandatory language' specifying the outcome that must be reached upon a finding that the substantive predicates have been met." *Dix v. County of Shasta*, 963 F.2d 1296, 1299 (9th Cir. 1992) (quoting *Thompson*, 490 U.S. at 462–63). The PBSP Hunger Strike Informational Sheet is not a regulation. Moreover, it merely sets forth the effects of starvation and avoiding fluids, the dangers of re-feeding, and the prison's policy on medical care during a hunger strike. It also urges the inmate to choose a representative to make important decisions should the hunger strike affect the inmate's ability to express his wishes. Docket No. 1 at 16–17. The informational sheet does not set forth any guidelines governing prison officials' action with regard to hunger-striking inmates. The Court finds that the PBSP Hunger Strike Informational Sheet did not establish an inmate's right to refuse meals or go on a hunger strike.

Nor do *Cruzan v. Dir., Mo. Dep't of Health*, *Washington v. Harper*, *In re Conservatorship of Burton*, or *Thor v. Sup. Ct* establish an inmate's right to refuse meals or go on a hunger strike. These cases focus on refusing medical treatment. None of these cases address the refusal to eat, much less the refusal to eat in a prison context.[7] Even if a right to refuse to eat can be inferred from the right to refuse medical treatment, this inferred right is subject to significant limitations in the prison context. *See Aamer v. Obama*, 742 F.3d 1023, 1041, 1040 (D.C. Cir. 2014) (explaining that the "overwhelming majority of courts have concluded . . . that absent exceptional circumstances prison officials may force-feed a starving inmate actually facing the risk of death") (listing cases); *see also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (federal prisoner's allegation of force-feeding by prison authorities did not state constitutional claim when attachments to pleadings reflected a medical determination that force-feeding was necessary to the

---

[7] In *Cruzan*, the Supreme Court held that a competent person has a liberty interest in refusing unwanted treatment, including lifesaving hydration and nutrition. *Cruzan*, 497 U.S. at 277–78. In *Washington*, the Supreme Court held that a prisoner possesses "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington*, 494 U.S. at 221–22. In *In re Conservatorship of Burton*, the state appellate court concluded that the inmate's hunger strike was based on an irrational thought process and that the lower court properly concluded that inmate lacked medical capacity to consent to medical treatment. *Burton*, 170 Cal. App. 4th at 1024–25. In *Thor*, the state court concluded that a competent, informed adult had the right to refuse life-sustaining medical treatment. *Thor*, 5 Cal. 4th at 744.

inmate's health, and that regulations authorized the force-feeding of hunger-striking inmates); *In re Soliman*, 134 F. Supp. 2d 1238, 1254 (N.D. Ala. 2001) (finding that force-feeding a hunger-striking inmate did not violate inmate's First Amendment rights).

Finally, the NLRA is inapplicable here. As used in the NLRA, the term "strike" does not refer to hunger strikes. Instead, it refers to "any . . . concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees." 29 U.S.C. § 142.

Although Plaintiff's above arguments have not demonstrated that his hunger strike was protected activity, the Court construes Plaintiff's claim liberally and notes that in the amended complaint, Plaintiff also alleges that his hunger strike was intended to protest the SHU living conditions. Am. Compl. at 4–5. The Court is thus required to examine whether, in a prison context, a hunger strike protesting conditions of confinement qualifies as protected speech under First Amendment jurisprudence.

Neither the Supreme Court nor the Ninth Circuit has directly addressed whether a hunger strike is protected activity for the purposes of a First Amendment retaliation claim. Defendants urge the Court to follow the district court in *Fulton v. Lamarque*, No. C 03-4709 RMW (PR), 2008 WL 901860 (N.D. Cal. Mar. 31, 2008), and find that a hunger strike is not protected conduct for purposes of a First Amendment retaliation claim.[8] Defendants overstate the holding in *Fulton*. In *Fulton*, the strike was not solely a hunger strike. The plaintiffs' conduct there consisted of an eight-day work strike, a three-day hunger strike, assaults and threats of assaults on other inmates

---

[8] Defendants also cite two additional out-of-circuit cases, *Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d. Cir 1989) and *Brown v. McGinnis*, No. 05–CV–758S, 2012 WL 267638, at *3–*4 (W.D. N.Y. Jan. 30, 2012), that allegedly indicate that an inmate's hunger-strike is not a constitutionally protected activity. These cases are not binding on this court. *Camreta*, 563 U.S. at 709 n.7. Also, neither of these cases directly addresses whether engaging in a hunger strike is a protected activity. In *Grand Jury Subpoena John Doe*, the Second Circuit held that the district court's order requiring that a hunger-striking inmate be forcibly fed did not violate that inmate's constitutional rights. *Grand Jury Subpoena*, 150 F.3d at 172. In *Brown*, the district court was considering a summary judgment motion, and assumed for the purposes of the summary judgment motion that the hunger strike was protected activity. *Brown*, 2012 WL 267638, at *3. The *Brown* court ultimately granted defendants qualified immunity, finding that it was not clearly established whether a hunger strike was protected activity. *Id.* at *4.

1    who refused to participate in the strike, and disruption to the prison's ability to distribute meals to

2    inmates. *Fulton*, 2008 WL 901860, at *5.  The *Fulton* court stated that there was no First

3    Amendment right to engage in this particular kind of strike. *Id.*  Here, Plaintiff's hunger strike

4    consisted solely of refusing meals.  The *Fulton* court did not address whether there was a First

5    Amendment right to engage in a hunger strike alone, so *Fulton* is inapplicable here.

6        The Court turns to the Supreme Court's First Amendment jurisprudence for guidance.  The

7    Supreme Court has recognized that the First Amendment does not solely protect the "spoken or

8    written word," but also protects "conduct [that] may be sufficiently imbued with elements of

9    communication to fall within the scope of the First and Fourteenth Amendments." *Texas v.*

10   *Johnson*, 491 U.S. 397, 404 (1989) (internal citations and quotation marks omitted).  "In deciding

11   whether particular conduct possesses sufficient communicative elements to bring the First

12   Amendment into play, [the Supreme Court asks] whether '[a]n intent to convey a particularized

13   message was present, and [whether] the likelihood was great that the message would be

14   understood by those who viewed it.'" *Id.* at 404 (internal citation omitted).  The Supreme Court

15   went on to describe several examples of "expressive" conduct which were protected under the

16   First Amendment:  students wearing black armbands to protest American military involvement in

17   Vietnam; a sit-in by blacks in a "whites only" area to protest segregation; wearing of American

18   military uniforms in a dramatic presentation criticizing American involvement in Vietnam;

19   picketing about a wide variety of causes; attaching a peace sign to the flag; refusing to salute the

20   flag; and displaying a red flag. *Id.*  A hunger strike that is intended to convey a particularized

21   message and has a high likelihood of conveying that message is therefore speech protected by the

22   First Amendment.

23        Here, Plaintiff describes his hunger strike as a "peaceful protest" that was aimed at

24   bringing public attention to SHU living conditions, and to [Plaintiff's] placement in SHU due to a

25   "vague and arbitrary (sic) applied gang validation process."  FAC at 5.  Accepting as true all of the

26   factual allegations contained in the amended complaint, and keeping in mind that *pro se* pleadings

27   must be liberally construed, *Balistreri*, 901 F.2d at 699, the Court finds that Plaintiff's allegations

28   that prison officials retaliated against him for engaging in a hunger strike intended to protest SHU

United States District Court
Northern District of California

12

living conditions state a cognizable claim for First Amendment retaliation.  Defendants' motion to dismiss Plaintiff's First Amendment retaliation claims for failure to state a claim is DENIED.

## II.    SUMMARY JUDGMENT MOTION

### A.    Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp*, 477 U.S. at 322–23.  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.*  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In deciding the summary judgment motion, the Court has considered the entire record.

United States District Court
Northern District of California

### B.    Housing Transfer Claim

Plaintiff alleges that Defendants transferred him to Unit C12 in retaliation for his exercise of his First Amendment rights and with deliberate indifference to his safety.

#### 1.    Officer Brunner

It is undisputed that Officer Brunner had no involvement in Plaintiff's transfer from Unit C3 to Unit C12.  Officer Brunner had no involvement in the decision to transfer Plaintiff, and had no involvement in the actual transfer of Plaintiff.  Brunner Decl. ¶ 9.  Viewing the record in the light most favorable to Plaintiff, the Court finds that there is no triable issue of fact as to whether Officer Brunner caused any constitutional deprivation arising out of Plaintiff's housing transfer.  Accordingly, the Court GRANTS summary judgment in favor of Officer Brunner as to the claims that Officer Brunner transferred Plaintiff to Unit C12 in retaliation for Plaintiff's exercise of his First Amendment rights and with deliberate indifference to Plaintiff's safety.

#### 2.    First Amendment Retaliation (Officer Drager)

It is undisputed that Officer Drager had no involvement in the decision to transfer Plaintiff.  Drager Decl. ¶ 7.  But, the Ninth Circuit has stated that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Further, a public employee "causes" a constitutional violation for purposes of 42 U.S.C. § 1983 when he has "some kind of direct personal participation in the deprivation."  *Id.* at 744.  Here, Plaintiff has alleged that on August 8, 2013, Officer Drager ordered Plaintiff to pack up and prepare to move to the "debriefer unit."  FAC at 6–7.  Although Officer Drager denies making this statement and states that he has no memory as to whether he facilitated Plaintiff's housing transfer, Drager Decl. ¶ 6, the Court must assume the truth of the evidence submitted by the nonmoving party for summary judgment purposes.  *See Leslie*, 198 F.3d at 1158.   The Court therefore presumes, for the purpose of summary judgment, that Officer Drager personally participated in Plaintiff's housing transfer.

Plaintiff alleges that Officer Drager transferred him to Unit C12 in retaliation for Plaintiff's

United States District Court
Northern District of California

1    litigation and grievance activity, and for Plaintiff engaging in "his constitutionally protected right

2    to refuse to eat."  FAC at 12.  Defendants argue that they are entitled to summary judgment

3    because (1) Plaintiff was not engaged in protected activity; (2) Defendants' conduct did not chill

4    Plaintiff's speech; and (3) Plaintiff was transferred to Unit C12 in order to reasonably advance a

5    legitimate correctional goal.  Docket No. 34 at 18–20.

6         "Within the prison context, a viable claim of First Amendment retaliation entails five basic

7    elements:  (1) An assertion that a state actor took some adverse action against an inmate (2)

8    because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

9    exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

10   correctional goal."  *Rhodes*, 408 F.3d at 567–68 (footnote omitted); *accord Pratt v. Rowland*, 65

11   F.3d 802, 806 (9th Cir. 1995) (prisoner suing prison officials under § 1983 for retaliation must

12   allege that he was retaliated against for exercising his constitutional rights and that the retaliatory

13   action did not advance legitimate penological goals, such as preserving institutional order and

14   discipline).  Retaliation by a state actor for the exercise of a constitutional right is actionable under

15   42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper.  *See*

16   *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977).  Retaliation,

17   though it is not expressly referred to in the Constitution, is actionable because retaliatory actions

18   may tend to chill individuals' exercise of constitutional rights.  *See Perry v. Sindermann*, 408 U.S.

19   593, 597 (1972).

20        The prisoner must show that the type of activity he was engaged in was constitutionally

21   protected, that the protected conduct was a substantial or motivating factor for the alleged

22   retaliatory action, and that the retaliatory action advanced no legitimate penological interest.

23   *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (inferring retaliatory motive from

24   circumstantial evidence).  The prisoner bears the burden of pleading and proving absence of

25   legitimate correctional goals for the conduct of which he complains.  *Pratt*, 65 F.3d at 806.  At

26   that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that

27   the retaliatory action was narrowly tailored to serve a legitimate penological purpose.  *See*

28   *Schroeder v. McDonald*, 55 F.3d 454, 461–62 (9th Cir. 1995) (defendants had qualified immunity

15

1   for their decision to transfer prisoner to preserve internal order and discipline and maintain

2   institutional security).

3          Retaliation claims brought by prisoners must be evaluated in light of concerns over

4   "excessive judicial involvement in day-to-day prison management, which 'often squander[s]

5   judicial resources with little offsetting benefit to anyone.'" *Pratt*, 65 F.3d at 807 (quoting *Sandin*

6   *v. Conner*, 515 U.S. 472, 482 (1995)).  In particular, courts should "'afford appropriate deference

7   and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for

8   conduct alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).

9          The court should apply the four-factor test from *Turner v. Safley*, 482 U.S. 78 (1978), to

10   determine whether the proffered legitimate penological interest is reasonably related to a

11   regulation that infringes on a prisoner's constitutional rights even in a retaliation analysis.  *See*

12   *Brodheim v. Cry*, 584 F.3d 1262, 1272 (9th Cir. 2009) (noting that Ninth Circuit's practice of

13   balancing the importance of the legitimate penological interest against the importance of the

14   prisoner's infringed right was disapproved by the Supreme Court in *Shaw v. Murphy*, 532 U.S.

15   223 (2001)).  The four-factor *Turner* test considers:

16          (1) whether the regulation is rationally related to a legitimate and neutral governmental
            objective, (2) whether there are alternative avenues that remain open . . . to exercise the
17          right, (3) the impact that accommodating the asserted right will have on other guards and
            prisoners, and on the allocation of prison resources; and (4) whether the existence of easy
18          and obvious alternatives indicates that the regulation is an exaggerated response by prison
            officials.

19

20   *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) (citing *Turner*, 482 U.S. at 89).

21                          **a.      Because of the Protected Conduct**

22          Plaintiff alleges that he was retaliated against for his litigation and grievance activity, and

23   for engaging in "his constitutionally protected right to refuse to eat."  FAC at 12.  The Court

24   analyzes whether Plaintiff's allegations have stated conduct that is protected by the First

25   Amendment for the purposes of a retaliation claim, and if this conduct motivated the alleged

26   retaliatory actions.

27                          **i)      Litigation and Grievance Activity**

28          It is undisputed that, prior to engaging in a hunger strike, Plaintiff filed two state habeas

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    petitions challenging his validation as a prison gang member, Docket No. 1-4 at 5–7 and 10–12;

2    submitted four grievances, Docket No. 1-3 at 19 and Docket No. 1-4 at 1–4; and filed a petition

3    with the United Nations regarding conditions of confinement at PBSP and within the CDCR, FAC

4    at 9.

5         Prisoners have a constitutional right of access to the courts. *See Lewis v. Casey*, 518 U.S.

6    343, 350 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977). A prisoner's right to access the court

7    also protects the right to utilize established prison grievance procedures and to petition the

8    government for redress of grievances. *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)

9    *overruled on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001); see also *Turner*,

10   482 U.S. at 84 (prisoners retain the constitutional right to petition the government for the redress

11   of grievances (citing *Johnson v. Avery*, 393 U.S. 483 (1969)). The Ninth Circuit has recognized

12   that there is a clearly established First Amendment right to pursue civil rights litigation in the

13   courts. *See Schroeder*, 55 F.3d at 461 (recognizing First Amendment right to pursue civil

14   litigation in the courts); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (same).

15        However, there is nothing in the record that indicates that Officer Drager was aware of

16   Plaintiff's litigation and grievance activity. When Officer Drager was asked why Plaintiff was

17   being transferred from Unit C3 to Unit C12, Officer Drager made no mention of Plaintiff's

18   litigation or grievance activity and only referenced the hunger strike in his answer. Docket No. 48

19   at 17, 23, and 27. Viewing the facts in the light most favorable to Plaintiff, the Court finds that

20   Plaintiff has failed to raise a genuine issue of material fact as to whether Officer Drager transferred

21   Plaintiff to Unit C12 in retaliation for Plaintiff's litigation and grievance activity.

22                    **ii)      Hunger Strike Participation**

23        As discussed *supra* in Section I.B.2, a hunger strike is protected conduct under the First

24   Amendment if it was intended to convey a particularized message of protest and that the hunger

25   strike was likely to be understood as a protest. It is undisputed that Plaintiff engaged in a hunger

26   strike to protest SHU living conditions and the gang validation process. FAC at 5. It is also

27   undisputed that Officer Drager and CDCR prison officials understood the hunger strike as a

28   protest. The record shows that on July 10, 2013, when Plaintiff was interviewed by Officer

United States District Court
Northern District of California

1   Drager regarding his refusal of meals, Plaintiff informed Officer Drager that his hunger strike was

2   a protest of SHU living conditions.  Docket No. 38-2 at 14.  The Court therefore finds that

3   Plaintiff's July 2013 and August 2013 hunger strikes constituted conduct protected under the First

4   Amendment.  *Texas*, 491 U.S. at 404.

5        The Court now addresses whether Officer Drager transferred Plaintiff because he was

6   participating in hunger strikes.  Officer Drager implied that if Plaintiff discontinued his hunger

7   strike, he might not be moved, stating "You guys want to play games with this hunger strike and

8   make my job harder, I can play games too.  You guys are moving one way or another.  I suggest

9   you either start eating or pack it up."  FAC at 5.  Viewing the facts in the light most favorable to

10  Plaintiff, the Court finds that there is a triable issue of fact as to whether Officer Drager transferred

11  Plaintiff to Unit C12 in retaliation for Plaintiff engaging in a hunger strike.

12                **b.**        **Chilling Effect**

13       Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation

14  claim because their conduct did not chill Plaintiff's speech.  Defendants argue that "it is doubtful

15  that the alleged statements from . . . Drager, or Plaintiff's move to another SHU housing unit,

16  would deter an inmate of ordinary firmness from participating in future hunger-strikes."  Docket

17  No. 34 at 19.  Defendants further argue that the fact that Plaintiff continued to refuse food for

18  another two days after the cell transfer, until August 10, 2013, indicates that there was no chilling

19  effect.  *Id.*

20       A prisoner need not demonstrate a *total* chilling of his First Amendment rights in order to

21  establish a retaliation claim.  *See Rhodes*, 408 F.3d at 568–69 (rejecting argument that inmate did

22  not state a claim for relief because he had been able to file inmate grievances and a lawsuit).  That

23  a prisoner's First Amendment rights were chilled, though not necessarily silenced, is enough.  *Id.*

24  at 569 (destruction of inmate's property and assaults on the inmate enough to chill inmate's First

25  Amendment rights and state retaliation claim, even if inmate filed grievances and a lawsuit).

26  "'[A] retaliation claim may assert an injury no more tangible than a chilling effect on First

27  Amendment rights.'"  *Brodheim v. Cry*, 584 F.3d 1262, 1269–70 (9th Cir. 2009) (citing *Gomez v.*

28  *Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001); *see also Burgess v. Moore*, 39 F.3d 216, 218 (8th

1    Cir. 1994) ("[A] threat of retaliation is sufficient injury if made in retaliation for an inmate's use of

2    prison grievance procedures."). Plaintiff has presented evidence, in the form of declarations from

3    other inmates, that Unit C12 is known as the housing unit for debriefers (also known as snitches or

4    informants), and that debriefers are targeted for assault by the majority of the prison population.

5    Docket No. 48 at 24 and 31. The Ninth Circuit has recognized that being labeled a debriefer or

6    snitch can place an inmate at risk of assault from other inmates. *Valandingham*, 866 F.2d at 1138.

7    Viewing the facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has

8    raised a triable issue of fact as to whether Officer Drager chilled the exercise of his First

9    Amendment rights when Officer Drager transferred Plaintiff Unit C12.

10                            **c.       Legitimate Correctional Goal**

11            Defendants argue that Plaintiff's transfer to Unit C12 reasonably advanced the legitimate

12    correctional goal of ensuring that hunger-strikers were medically monitored. However,

13    Defendants make only vague statements about institutional need and Unit C12's proximity to

14    medical monitoring. According to Facility Captain Olson:

15            Pursuant to [CDCR Operational Procedure No. 228, which delineated the roles and
      responsibilities of prison staff during individual or mass hunger strikes], during the 2013
16    mass inmate hunger strike, certain hunger strike participants were relocated to Unit C12
      due to institutional need. It should be noted that based on its location, unit C12 in SHU is
17    within close proximity to program and medical facilities in C SHU.

18    Olson Decl. ¶ 10. Yet there is nothing in the record that indicates that there was an institutional

19    need to transfer Plaintiff or that Plaintiff was suffering from health issues that required medical

20    monitoring. In contrast, Plaintiff has provided evidence that, during the housing transfer, Officer

21    Drager told Plaintiff: "I suggest you either start eating or pack it up." FAC at 5. A jury could

22    reasonably infer from Officer Drager's statement that the housing transfer was motivated by

23    Plaintiff's participation in the hunger strike. In addition, Plaintiff states that "Unit [C]12 is the

24    furthest from the medical facility." Docket No. 51 at 2. Viewing the facts in the light most

25    favorable to Plaintiff, the Court concludes that there is a genuine dispute as to whether Plaintiff's

26    transfer to Unit C12 reasonably advanced a legitimate correctional goal. *See, e.g., Mt. Healthy*

27    *City Sch. Dist. Bd. of Educ.*, 429 U.S. at 283–84 (retaliation by a state actor for the exercise of a

28    constitutional right is actionable under § 1983, even if the act, when taken for different reasons,

United States District Court
Northern District of California

1     would have been proper).

2                    **3. Eighth Amendment Claim (Officer Drager)**

3              Plaintiff alleges that Officer Drager acted with deliberate indifference to Plaintiff's safety

4     when he transferred Plaintiff to Unit C12, which is known as the "debriefer unit." FAC at 13–14.

5     Defendants argue that they are entitled to summary judgment on this Eighth Amendment claim

6     because Officer Drager had no involvement in the decision to transfer Plaintiff, the housing

7     transfer was for protective reasons, and Officer Drager did not cause any harm to Plaintiff by

8     transferring him.

9              The Eighth Amendment requires that prison officials take reasonable measures to

10    guarantee the safety of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In particular,

11    prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Id.*

12    at 833. The failure of prison officials to protect inmates from attacks by other inmates or from

13    dangerous conditions at the prison violates the Eighth Amendment when two requirements are

14    met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is,

15    subjectively, deliberately indifferent to inmate health or safety. *Id.* at 834. A prison official is

16    deliberately indifferent if he knows of and disregards an excessive risk to inmate health or safety

17    by failing to take reasonable steps to abate it. *Id.* at 837.

18            Plaintiff has presented evidence from which it can be reasonably inferred that Officer

19    Drager knew of and disregarded a risk to Plaintiff's safety. Plaintiff provides evidence, in the

20    form of declarations from other inmates, that it is common knowledge among both inmates and

21    PBSP prison officials that Unit C12 is known as the housing unit for debriefers (also known as

22    snitches or informants), and that debriefers are targeted for assault by the majority of the prison

23    population. Docket No. 48 at 24 and 31. There is also evidence from which it can be reasonably

24    inferred that Officer Drager did not believe Plaintiff to be a debriefer, and that the transfer was

25    intended to punish Plaintiff for his participation in the hunger strike. When Plaintiff asked Officer

26    Drager why he referred to Plaintiff as a debriefer, Officer Drager responded that Plaintiff was

27    playing games by engaging in the hunger strike and that Officer Drager could play games too.

28    FAC at 6–7. Because the Court's function on a summary judgment motion is not to weigh

United States District Court
Northern District of California

20

conflicting evidence with respect to a disputed material fact, *see T.W. Elec. Serv., Inc.*, 809 F.2d at 630, the Court finds that there is a genuine issue of material fact as to whether Officer Drager was deliberately indifferent to Plaintiff's safety, in violation of Plaintiff's Eighth Amendment rights, when Officer Drager transferred Plaintiff to Unit C12.

The Court finds Defendants' countervailing arguments to be without merit. Contrary to Defendants' argument, Officer Drager's involvement in Plaintiff's housing transfer is sufficient for § 1983 liability. Plaintiff has presented evidence that Officer Drager physically assisted with Plaintiff's housing transfer. FAC at 6–7. Officer Drager's "direct personal participation" in the allegedly unconstitutional housing transfer is a basis for liability under § 1983. *Johnson*, 588 F.2d at 744. Defendants' argument that the housing transfer was for protective reasons is not supported by the record. Capt. Olson provides general reasons (institutional need and medical monitoring) why a hunger-striking inmate might be transferred to Unit C12, but does not specify whether these reasons applied to Plaintiff's transfer, and nothing else in the record establishes that these general reasons applied to Plaintiff. *See* Section II.B.2.c *supra*. In addition, an Eighth Amendment claim does not require that a plaintiff have suffered harm prior to bringing suit. *See Farmer*, 511 U.S. at 845; *see also Gonzalez v. CDCR*, 739 F.3d 1226, 1235 (9th Cir. 2014) (finding standing to bring Eighth Amendment challenge to prison's gang debriefing process, even though prisoner had not yet debriefed, where he alleged risk of retaliation from other gang members).

### C.    Referring to Plaintiff as a Debriefer

Plaintiff alleges that Defendants retaliated against him because he exercised his First Amendment rights, and that Defendants acted with deliberate indifference to Plaintiff's safety when they referred to Plaintiff as a debriefer. FAC at 13–14. Defendants argue that they are entitled to summary judgment on this claim because the alleged remarks constitute verbal abuse and are not actionable, and Plaintiff was never assaulted by other inmates for being a debriefer.

After reviewing the record and the applicable law, the Court finds that Defendants' arguments are inapplicable and that there is a genuine issue of material fact as to whether Officers Drager and Brunner referred to Plaintiff as a "debriefer" in retaliation for Plaintiff engaging in protected conduct and with deliberatel indifference to Plaintiff's safety, in violation of Plaintiff's

1    rights under the First and Eighth Amendment rights.

2                            **1.    Defendants' Arguments**

3            Defendants are incorrect that referring to Plaintiff as a "debriefer" is merely verbal abuse

4    and not actionable.  As discussed in Section I.B.1 *supra*, the Ninth Circuit has found that

5    deliberately spreading a rumor that a prisoner is a "snitch" in response to a prisoner's attempt to

6    seek redress for grievances may state a claim under 42 U.S.C. § 1983.  *See Valandingham*, 866

7    F.2d at 1138.  In addition, Plaintiff has presented evidence that debriefers are targeted for assault

8    by the majority of the prison population.  Docket No. 48 at 24 and 31.

9            Defendants are also incorrect that they are entitled to summary judgment because their

10   conduct did not yet result in any harm to Plaintiff.  As discussed in Section II.A.3 *supra*, an inmate

11   does not have to wait until he is actually assaulted before obtaining relief.  Courts have recognized

12   that being labeled a "snitch" can place an inmate at a risk of harm.  *See Valandingham*, 866 F.2d

13   at 1138–39 (reversing the district court's grant of summary judgment on retaliation claim); *see*

14   *also Wilkinson* v. *Austin*, 545 U.S. 209, 227 (2005) ("[t]estifying against, or otherwise informing

15   on, gang activities can invite one's own death sentence"); *cf. Helling v. McKinney*, 509 U.S. 25, 33

16   (1993) (rejecting argument that Eighth Amendment "does not protect against prison conditions

17   that merely threaten to cause health problems in the future, no matter how grave and imminent the

18   threat").

19                            **2.    First Amendment Retaliation**

20           Plaintiff alleges that Officers Drager and Brunner announced to other inmates that he was a

21   "debriefer" in retaliation for Plaintiff exercising his Plaintiff's litigation and grievance activity,

22   and for Plaintiff engaging in "his constitutionally protected right to refuse to eat."  FAC at 12.

23                            **a.    Litigation and Grievance Activity**

24           As discussed in Section II.B.2.a.i *supra*, Plaintiff's litigation and grievance activity

25   constituted protected conduct for the purposes of a First Amendment retaliation claim, but there is

26   nothing in the record that indicates that Officer Drager was aware of Plaintiff's litigation and

27   grievance activity.  However, there is evidence in the record from which it can be reasonably

28   inferred that Officer Brunner was aware of Plaintiff's litigation activity and referred to Plaintiff as

United States District Court
Northern District of California

                                                22

a "debriefer" because of that activity.  Specifically, when Officer Brunner was asked why he referred to the D Pod inmates — which included Plaintiff — as debriefers, Officer Brunner responded that "the captain" had the D Pod inmates on "'shit status' for filing lawsuits and being hungerstrike flip-floppers."  FAC at 8 and Docket No. 48 at 7.  Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to whether Officer Drager referred Plaintiff as a "debriefer" in retaliation for Plaintiff's litigation and grievance activity, but Plaintiff has demonstrated that there is a triable issue of fact as to whether Officer Brunner referred to Plaintiff as a debriefer because of Plaintiff's litigation and grievance activity.

### b.   Hunger Strike Participation

As discussed in Section II.B.2.a.ii *supra*, Plaintiff's July 2013 and August 2013 hunger strikes constituted conduct protected under the First Amendment.  There is evidence in the record from which it may be reasonably inferred that Officer Drager called Plaintiff a debriefer in retaliation for his participation in the hunger strike. When Officer Drager was asked why he referred to Plaintiff as a debriefer, Officer Drager responded that Plaintiff was playing games by engaging in the hunger strike and that Officer Drager could play games too.  FAC at 6–7. Similarly, there is also evidence in the record from which it may be reasonably inferred that Officer Brunner called Plaintiff a debriefer in retaliation for his participation in the hunger strike. When Officer Brunner was asked why he referred to the D Pod inmates — which included Plaintiff — as debriefers, Officer Brunner responded that "the captain" had the D Pod inmates on "'shit status' for filing lawsuits and being hungerstrike flip-floppers."  FAC at 8 and Docket No. 48 at 7.  Although Officers Drager and Brunner deny making these statements, the court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630. Viewing the facts in the light most favorable to Plaintiff, the Court finds that there is a triable issue of fact as to whether Officers Drager's and Brunner's alleged retaliatory actions were motivated by Plaintiff's participation in the hunger strike.

### 3.   Eighth Amendment Claim

23

As discussed in Section II.B.3 *supra*, Plaintiff has provided evidence that Officers Drager and Brunner did not believe Plaintiff to be a debriefer and that it is common knowledge among both inmates and PBSP prison officials that debriefers are targeted for assault by the majority of the prison population.  Docket No. 48 at 24 and 31.  Viewing the facts in the light most favorable to Plaintiff, the Court finds that there is a triable issue of fact as to whether Officers Drager and Brunner were deliberately indifferent to Plaintiff's safety when they referred to him as a debriefer loudly enough for other inmates to hear.

### D.     Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court considering a claim of qualified immunity makes a two-pronged inquiry: (1) whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) whether such right was clearly established at the time of the defendant's alleged misconduct.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 535 U.S. 194, 201 (2001)).  The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case.  *Pearson*, 555 U.S. at 236 (noting that while the *Saucier* sequence is often appropriate and beneficial, it is no longer mandatory).  "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the nonmovant.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

"[A] right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'  In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (citations omitted).  The inquiry of whether a constitutional right was clearly established must be undertaken in light of the "specific context" of the case, not as a broad general proposition.  *Saucier*, 533 U.S. at 202.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable

officer that his conduct was unlawful in the situation he confronted.  *Id.*; *see*, *e.g.*, *Pearson*, 555 U.S. at 243–45 (concluding that officers were entitled to qualified immunity because their conduct was not clearly established as unconstitutional as the "consent-once-removed" doctrine, upon which the officers relied, had been generally accepted by the lower courts even though not yet ruled upon by their own federal circuit).

A court determining whether a right was clearly established looks to "Supreme Court and Ninth Circuit law existing at the time of the alleged act."  *Community House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)).  In the absence of binding precedent, the court should look to all available decisional law, including the law of other circuits and district courts.  *See id.*  Unpublished district court decisions may also "inform" the court's analysis.  *Sorrels v. McKee*, 290 F.3d 965, 971–72 (9th Cir. 2002).  It will, however, "be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, [that the court] can conclude that the law was clearly established on the basis of unpublished decisions only."  *Id.*  Post-incident cases generally are not relevant unless they determine the law at the time of the incident, however.  *See Osolinski*, 92 F.3d at 936 (citation omitted).

### 1.      First Amendment Retaliation Claim

The question before the Court is whether Plaintiff's litigation and grievance activity and his participation in a hunger strike were clearly established rights for the purposes of qualified immunity.

### a.      Litigation and Grievance Activity

The Court has found that it is undisputed that there is a genuine issue of material fact as to whether Officer Brunner referred to Plaintiff as a debriefer in retaliation for Plaintiff's civil rights litigation.  At the time of the offense, the law was clearly established that an inmate has a First Amendment right to access the courts, *see Lewis*, 518 U.S. at 350, which also protects the right to utilize established prison grievance procedures and to petition the government for redress of grievances, *Bradley*, 64 F.3d at 1279.  Accordingly, Officer Brunner is not entitled to qualified immunity with respect to Plaintiff's claim that Officer Brunner retaliated against him for accessing

United States District Court
Northern District of California

1    the courts.

2                           **b.**    **Hunger Strike**

3            The Court has found that there is a genuine issue of material fact as to whether Officers

4    Brunner and Drager referred to Plaintiff as a debriefer, and whether Officer Drager transferred

5    Plaintiff to Unit C12, in retaliation for Plaintiff engaging in a hunger strike.  However, the Court

6    now finds that Officers Brunner and Drager are entitled to qualified immunity for these actions.

7            There is no Supreme Court precedent prior to — or after — August 8, 2013, discussing

8    whether participation in a hunger strike qualifies as speech protected under the First Amendment,

9    especially within a prison setting.  A search of Ninth Circuit cases also reveals no opinions prior to

10   — or after — August 8, 2013 addressing the question of whether an inmate's hunger strike is

11   "protected conduct."  In addition, a review of district court and out-of-circuit cases reveals only a

12   handful of published cases on the issue, none of which speak definitively about this issue.[9]  In

13   *Stefanoff v. Hays County, Tex.*, 154 F.3d 523, 527 (5th Cir. 1998), the Fifth Circuit noted that "a

14   hunger strike may be protected by the First Amendment if it was intended to convey a

15   particularized message."  *Id.* (citing *Texas*, 491 U.S. at 404).  However, the Fifth Circuit

16   concluded that the inmate's hunger strike and correspondence with the media was "sufficiently

17   disruptive" such that the defendant "had a legitimate penological interest in curtailing [it]."  *Id*.  In

18   *In re Soliman*, 134 F. Supp. 2d 1238, 1252–53 (N.D. Ala. 2001), the district court assumed that the

19   inmate had a First Amendment right to engage in a hunger strike to protest prison practices, but

20   found that the defendants' force-feeding of the inmate did not violate the inmate's First

21   Amendment right to conduct a hunger strike.

22           The remaining district court and out-of-circuit cases discussing this issue are not only

23   unpublished, but are also inconsistent in the depth of their analysis regarding whether a hunger

24   strike is considered protected speech in a prison setting.  *Compare Dumbrique v. Brunner*, No. 14-

25   _____

26   [9] The lack of clearly established law addressing this issue may be due in part to prisoner-plaintiffs'
     failure to prosecute their cases, *see, e.g., Morris v. McBride*, No. 14-CV-05269-WHO (PR)
27   (dismissed for failure to file amended complaint), or to appeal unfavorable decisions, *see, e.g.,
     Espinoza v. Kellogg*, 12-5414 BLF (PR) (court found that plaintiff's hunger strike was conduct
28   protected by the First Amendment but that defendants were entitled to qualified immunity;
     plaintiff did not appeal the decision).

United States District Court
Northern District of California

cv-02598-HSG, 2016 WL 3268875, at *7 and *14-*15 (N.D. Cal. June 15, 2016) (finding that hunger strike to protest SHU living conditions was protected conduct for the purposes of a First Amendment retaliation claim but granting qualified immunity because whether a hunger strike is "protected conduct" is not "clearly established" law); *Perez v. Gates*, No. 13-cv-05359-VC, 2015 WL 5569443, at *3 (N.D. Cal. Sept. 22, 2015) (assuming that a hunger strike was protected conduct for the purposes of a First Amendment retaliation claim but finding that claims related to the hunger strike were unexhausted); *Ellis v. Foulk*, No. 2:14-CV-00802 AC P, 2015 WL 4662766, at *6 (E.D. Cal. Aug. 5, 2015) (noting that "participating in a hunger strike can, in certain circumstances, constitute activity protected by the First Amendment" but finding that prisoner failed to state a retaliation claim where the basis of his claim was prisoner's preference to eat food from the canteen and in his cell); *Morris v. McBride*, No. 14-CV-05269-WHO (PR), 2015 WL 1519531, at *2 (N.D. Cal. Apr. 3, 2015) (finding that "going on a hunger strike may well meet the standard for exercising the constitutional right of free speech" but dismissing retaliation claim with leave to amend for failure to allege that plaintiff suffered harm); *Bruce v. Woodford*, No. 07–cv–00269–AWI–DLB PC, 2009 WL 256390, *3 (E.D. Cal. Feb. 3, 2009) (liberally construed, inmate stated cognizable retaliation claim when he alleged that he was placed in segregation for his jailhouse lawyer activities, hunger strike participation, and filing of grievances); *Ajaj v. Fed. Bureau of Prisons*, No. 08-2006 MSK MJW, 2011 WL 902440, at *12 (D. Colo. March 10, 2011) ("The Defendants do not appear to dispute that a hunger strike can constitute activity protected by the First Amendment, and the Court agrees that, in certain circumstances, it can.") (citing *Bruce*, 2009 WL 256390); *Gevas v. Ryker*, Civil No. 10-493-MJR, 2011 WL 711078, at *5 (S.D. Ill. Feb. 22, 2011) *reconsidered in part on other grounds by Gevas v. Ryker*, No. 10-CV-493-MJR-SCW, 2011 WL 1458075 (S.D. Ill. Apr. 15, 2011) (inmate sufficiently stated retaliation claim where the protected conduct was filing of grievances and declaring a hunger strike); *Brown v. Graham*, No. 9:07 CV 1353, 2010 WL 6428251, at *16 (N.D.N.Y. March 30, 2010) (same) (citing *Green v. Phillips*, No. 04 CIV. 10202 (TPG), 2006 WL 846272 (S.D.N.Y. Mar. 31, 2006)); *Hankins v. Beard*, Civil Action No. 07-332 Erie, 2009 WL 5821032, at *26 (W.D. Pa. Nov. 30, 2009), *report and recommendation adopted in relevant*

*part by Hankins v. Beard*, Civil Action No. 07-332 Erie, 2010 WL 454910 (W.D. Pa. Feb. 2, 2010) (hunger strike was protected activity under the First Amendment but challenged strip searches would have been conducted absent inmate's hunger strike; granting summary judgment in favor of defendants on retaliation claim); *Green*, 2006 WL 846272, at *3 (questioning validity of hunger strike as protected conduct, but assuming without deciding that it is for purposes of analyzing motion to dismiss) *with Khaldun v. Daughtery*, No. 09-cv-350-SEB-TAB, 2009 WL 5170039, at *1 (S.D. Ind. Dec. 17, 2009) ("[prisoner's] act of going on a hunger strike was not protected activity under the First Amendment"); *Lee v. Burke*, No. 07-CV-1718, 2007 WL 4608730, at *1 (W.D. La. Dec. 11, 2007) (finding that inmate's hunger strike did not qualify as First Amendment speech when inmate did not allege that the hunger strike was intended to convey a particular message); *White v. Suneja*, No. 10-CV-332-JPG, 2010 WL 4719663, at *1 (S.D. Ill. Nov. 15, 2010) ("The Court is not aware of any specific guarantee under the First Amendment, or any other constitutional provision, that protects inmate hunger strikes.").

Notably, at least one district court granted qualified immunity on this same underlying claim prior to September 7, 2011. *See Brown*, 2010 WL 6428251, at *23 (granting qualified immunity on prisoner's retaliation claim because whether a hunger strike is "protected conduct" is not "clearly established" law).

Accordingly, the Court GRANTS summary judgment in favor of Defendants with respect to Plaintiff's claims that he was called a debriefer and transferred to Unit C12 in retaliation for his hunger strike in violation of his First Amendment.

### 2.     Eighth Amendment Claim

The question before the Court is whether, for the purposes of qualified immunity, Plaintiff had a right to be free from deliberate indifference to his safety, and, more specifically, whether he had a right not to be labelled a debriefer in front of other inmates. The Court has found that there is a genuine issue of material fact as to whether Officers Brunner and Drager labelled Plaintiff a debriefer within earshot of other inmates and transferred Plaintiff to a "debriefer unit," in violation of his rights under the Eighth Amendment. At the time of the offense, the law was clearly established that a prison official violates the Eighth Amendment when the official acts with

United States District Court
Northern District of California

deliberate indifference to inmate safety and the official's action results in the inmate being "incarcerated under conditions posing a substantial risk of serious harm." *See Farmer*, 511 U.S. at 834. At that time, the law was also clearly established that telling other inmates that a prisoner is a "snitch" violated an inmate's right to be free from harm. *Valandingham*, 866 F.2d at 1138 (Eighth Amendment claim stated where prisoner alleged that he was approached by fellow prisoners and threatened with harm because defendants had told other inmates that he was a snitch); *see also Miller v. Williams*, 976 F.2d 737 (9th Cir. 1992) ("This court has recognized a claim under 42 U.S.C. § 1983 'for violation of [an inmate's] right to be protected from violence while in custody, [and] also for violation of his right of access to the courts' where prison officials labeled an inmate as a 'snitch' in retaliation for the inmate petitioning prison and government officials for a redress of his grievances.") (citing *Valandingham*); *cf. Douglas v. Oregonian Pub. Co.*, 465 F. App'x 714, 715 (9th Cir. 2012) (prisoner's allegation that "other inmates threatened him as a result of the state defendants' actions in falsely labeling him a 'snitch' . . . sufficiently alleged a Fourteenth Amendment violation of his right to safety while in custody.").

If Plaintiff's version of events is credited, a jury reasonably could conclude that Defendants referred to Plaintiff as a debriefer and transferred him to a "debriefer unit" because they were aware that doing so would expose Plaintiff to substantial risk of serious harm. Accordingly, qualified immunity may not be granted at this stage, because Defendants' entitlement to immunity will depend on the resolution of disputed facts. *See Tolan*, 134 S. Ct. at 1866–68 (in conducting qualified immunity analysis, courts must draw all reasonable inferences in favor of the non-moving party); *see, e.g., Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (noting that four circuits have held that labeling an inmate a snitch violates the guard's duty to protect inmates , and denying qualified immunity where a prison guard falsely labeled an inmate as a snitch, concluding the guard was on fair notice that an inmate labeled as a snitch faces substantial risk of serious harm: "after all, who better knows the opprobrium and consequent effect thereof that attaches to the label of snitch than those who work daily within the inmate population").

**E.      Requests for Judicial Notice**

1    Defendants have requested that the Court take judicial notice of the order granting

2 summary judgment in *Treglia v. Kernan*, No. 5:12-cv-02522-LHK (N.D. Cal. Jan. 29, 2015).

3 Docket No. 42.  Pursuant to Federal Rule of Evidence 201(b),

> [t]he court may judicially notice a fact that is not subject to reasonable dispute because it:
> (1) is generally known within the trial court's territorial jurisdiction; or
> (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

6 Fed. R. Evid. 201(b).  Although the Court "may take judicial notice of the existence of unrelated

7 court documents . . . it will not take judicial notice of such documents for the truth of the matter

8 asserted therein."  *In re Bare Escentuals, Inc. Sec. Lit.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal.

9 2010) (in considering defendant's motion to dismiss, the court took judicial notice of the existence

10 of unrelated court documents, but declined to take judicial notice of truth of the matters set forth in

11 these unrelated court documents); *see also McMunigal v. Bloch*, No. C 10–02765 SI, 2010 WL

12 5399219, *2 n. 1 (N.D. Cal. Dec. 23, 2010) (granting judicial notice of documents filed in another

13 lawsuit for purposes of noticing the existence of the lawsuit, claims made in the lawsuit, and that

14 various documents were filed, but not for the truth of the matters asserted therein).  Accordingly,

15 the Court GRANTS Defendants' request for judicial notice of the existence of the order granting

16 summary judgment in *Treglia v. Kernan*, but not the truth of the matters asserted in the document.

17                                    **CONCLUSION**

18    For the foregoing reasons, the Court orders as follows:

19    1.    Defendants' motion to dismiss the §1983 and First Amendment claims for failure

20 to state a claim is DENIED.

21    2.    The Court GRANTS summary judgment in favor of Officer Brunner as to

22 Plaintiff's claims that Officer Brunner transferred Plaintiff to Unit C12 in violation of his First

23 Amendment and Eighth Amendment rights, and that Officer Brunner referred to Plaintiff as a

24 "debriefer" in retaliation for his hunger strike.  The Court GRANTS summary judgment in favor

25 of Officer Drager as to Plaintiff's claim that Officer Drager transferred Plaintiff to Unit C12 and

26 referred to him as debriefer in retaliation for his litigation and grievance activity and in retaliation

27 for his hunger strike, in violation of his First Amendment rights.  The Court DENIES summary

28 judgment as to the following claims: (1) Officer Brunner referred to Plaintiff as a debriefer in

United States District Court
Northern District of California

1   retaliation for Plaintiff's litigation and grievance activity, in violation of the First Amendment; (2)

2   Officer Brunner referred to Plaintiff as a debriefer with deliberate indifference to Plaintiff's safety,

3   in violation of the Eighth Amendment;  (3) Officer Drager referred to Plaintiff as a debriefer with

4   deliberate indifference to Plaintiff's safety, in violation of the Eighth Amendment; and (4) Officer

5   Drager transferred Plaintiff to Unit C12 with deliberate indifference to Plaintiff's safety, in

6   violation of the Eighth Amendment.

7           3.      For the foregoing reasons, the instant case is REFERRED to Judge Vadas pursuant

8   to the Pro Se Prisoner Settlement Program for settlement proceedings on the remaining four

9   claims in this action, as described above.  The proceedings shall take place within ninety (90) days

10  of the filing date of this order.  Judge Vadas shall coordinate a time and date for a settlement

11  conference with all interested parties or their representatives and, within ten (10) days after the

12  conclusion of the settlement proceedings, file with the court a report regarding the prisoner

13  settlement proceedings.

14          The Clerk shall send Magistrate Judge Vadas a copy of this order.

15          4.      Other than the settlement proceedings ordered herein, and any matters Magistrate

16  Judge Vadas deems necessary to conduct such proceedings, this action is hereby STAYED until

17  further order by the Court following the resolution of the settlement proceedings.  The Clerk shall

18  ADMINISTRATIVELY CLOSE this case until further order of the Court.

19          This order terminates Docket Nos. 34 and 52.

20          **IT IS SO ORDERED.**

21  Dated:  July 14, 2016

22                                                  _Haywood S. Gill, Jr._

23                                                  HAYWOOD S. GILLIAM, JR.
                                                    United States District Judge

24

25

26

27

28

United States District Court
Northern District of California